*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *UNITED STATES OF AMERICA* ) | |
| ) | |
| *v.* ) | *Criminal No. 06-96-P-H* |
| ) | |
| *MANUEL RIVAS,* ) | |
| ) | |
| *Defendant* ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Manuel Rivas, charged in an indictment with knowingly possessing, with intent to distribute, fifty grams or more of a mixture or substance containing cocaine base in violation of 18 U.S.C. § 841(a)(1) and aiding and abetting such conduct in violation of 18 U.S.C. § 2, *see* Indictment (Docket No. 1), seeks to suppress fruits of a stop by drug-enforcement agents of a vehicle he was driving in Portland, Maine on October 5, 2006, *see* Motion To Suppress Physical Evidence and Statements, etc. ("Motion To Suppress") (Docket No. 15). An evidentiary hearing was held before me on April 4 and 6, 2007. After both sides rested, counsel argued orally. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

**I. Proposed Findings of Fact**

On October 4, 2006 Ernest MacVane, a Windham, Maine police officer who serves as a task-force agent for the Portland, Maine office of the United States Drug Enforcement Administration ("DEA"), received a call from a source of information ("SOI") informing him that the SOI had met with a person named Barry Wright who was in possession of about two ounces of cocaine base. The SOI also told MacVane that (i) Wright had told him he possessed a half kilogram of cocaine, (ii)

Wright wanted him (the SOI) to sell the cocaine for him, (iii) the SOI had declined to take possession of the drugs then and there but had agreed to meet with Wright later that evening at the Lafayette Building on Congress Street in Portland, and (iv) Wright was driving a tan sport utility vehicle ("SUV") with a Massachusetts registration.

MacVane had never seen or heard of Wright but knew the SOI, who had served as a documented DEA confidential informant ("CI") under MacVane's supervision from September 2005 through February 2006. In August 2005, just prior to becoming a CI, the SOI had provided information to MacVane that ultimately led to the conviction of two co-defendants in a criminal case in federal court. A third person also eventually was convicted based on information obtained from those two co-defendants. Per an understanding with the DEA, the SOI was paid for the provision of this information. In February 2006, after MacVane learned from another drug-enforcement agent that the SOI was engaging in unauthorized drug transactions, MacVane sought and received approval to deactivate him as a CI. Following his discharge as a CI, the SOI continued sporadically to phone MacVane with information; however, MacVane did not act on any of that information until he received the SOI's call regarding Wright on October 4, 2006.

After speaking with the SOI that day, MacVane ran a search in a DEA database that revealed that a person named Barry Wright had been involved in cocaine trafficking in the Lewiston, Maine area. MacVane phoned the drug-enforcement agent who had worked on Wright's case, who confirmed that Wright had been arrested for trafficking in cocaine. MacVane traveled to the area of the Lafayette Building to keep a watch out for the tan SUV. He saw nothing of significance. At about 11:30 p.m. the SOI phoned MacVane to report that Wright and some of Wright's companions had arrived at a Motel 6 on Riverside Street in Portland. MacVane drove there and observed a group of people getting out of an SUV. MacVane phoned the SOI and described one of the individuals he had seen exiting the SUV.

2

The SOI told MacVane the description and clothing of the individual matched those of Wright. At about midnight MacVane ceased surveillance for the night because he was by himself and unable safely to take any action.

At about 6 p.m. the following evening MacVane again received a call from the SOI. The SOI informed him that cocaine was about to be transported in a maroon Chevrolet Impala bearing Michigan license plate number ABL6474 from the Lafayette Building to the parking garage of the Radisson Hotel ("Radisson") in Portland. MacVane ran a check of the license plate, which revealed that it was attached to a rental vehicle. Because MacVane was then in the midst of a different investigation, he sought assistance in the matter from Patrick Lally, a Westbrook, Maine police detective assigned as an agent to the Portland office of the Maine Drug Enforcement Agency ("MDEA"). He filled Lally in on the information received from the SOI, including the tip that a maroon Chevrolet Impala rental car bearing Michigan license plate number ABL6474 was *en route* to the Radisson with cocaine and that a black male named Barry Wright might be operating the vehicle.

MacVane also revealed to Lally the SOI's identity, explaining that the SOI had been a documented DEA CI but had been deactivated and indicating that the SOI had provided credible information in the past. Lally had never personally met or spoken with the SOI but knew of him; specifically, he knew that the SOI had a lengthy criminal history, was a target of an ongoing MDEA investigation and recently had sold cocaine base to an undercover MDEA agent. Lally also knew, from his own experience, that someone involved in cocaine trafficking is in a position to know something about cocaine trafficking. Lally briefed a colleague at the Portland MDEA office, MDEA special agent Scott Durst, on the substance of MacVane's call. Lally then ran a Department of Motor Vehicles check that corroborated the existence of a Barry Wright and a check on the Michigan license plate that confirmed it was registered to an Alamo rental car matching the description of the vehicle

given by the SOI. Lally knew from his training and experience that drugs often are transported in rental cars. Like Lally, Durst recognized the name of the SOI and knew he had been involved in drug trafficking, was a target of an MDEA investigation and had sold drugs to an undercover MDEA agent. Durst believed, based on the information available to him at the time, that the SOI was likely to be in a position to have personal knowledge of a drug-trafficking crime.

Within half an hour after phoning Lally, MacVane received another call from the SOI. The SOI reported that the maroon passenger car had just been involved in a traffic accident but was continuing on to the Radisson garage. MacVane again called Lally, relaying that the car had been involved in a hit-and-run accident and would be at the Radisson. Lally updated Durst, whereupon the two plainclothed agents walked to the Radisson garage (which happened to be across the street from the MDEA office) in search of a vehicle matching the description given by the SOI. Their effort was quickly rewarded. As they ascended the parking garage's exit ramp, they observed a maroon Chevrolet Impala driven by a black male, with a black male passenger, heading down the ramp toward them. As the car passed them by, they saw that it bore Michigan license plate number ABL 6474 and that its rear bumper had sustained what appeared to Lally (based on experience with damage to his own cars) to have been at least $1,000 worth of fresh damage, including deep scrapes. Durst phoned the Portland Police Department ("PPD") for backup to stop the car and investigate allegations its occupants had been involved in a hit-and-run accident and/or drug trafficking. However, as Lally and Durst observed the vehicle pulling up to the garage exit gate they decided to stop it themselves for fear they would lose sight of it before PPD officers could respond. Durst walked past the front of the vehicle, still stopped at the exit gate, and approached the driver, whom he eventually identified as the defendant, Manuel Rivas. He asked the defendant to cut off the engine and exit the vehicle, and the defendant complied. Lally approached the passenger and asked him to get out of the car. The

passenger did so. Lally realized, upon identifying the passenger, that he was the SOI. Durst also recognized him as the SOI. Lally and Durst questioned the men, Durst moved the car so that it would not block egress from the parking garage, and Durst and/or Lally asked the defendant whether he would mind if they searched the car. He assented. Cocaine was retrieved from behind the car's dashboard.

Neither MacVane, Lally nor Durst was investigating Wright or the defendant prior to MacVane's receipt of the SOI's initial call on October 4, 2006. MacVane has been a law-enforcement officer for seven-and-a-half years, Lally for thirteen years and Durst for eighteen years.

## II. Discussion

As confirmed by defense counsel at hearing, the defendant raises one point: that the stop by Lally and Durst of the Chevrolet Impala at the Radisson parking garage on October 5, 2006 constituted an unlawful seizure pursuant to the Fourth Amendment inasmuch as the agents did not possess the requisite reasonable articulable suspicion of criminal activity to effectuate such a stop.

The First Circuit has observed:

> The law governing investigative stops is well understood. A law enforcement officer ordinarily may not stop someone and restrain his freedom to walk away unless the officer has a reasonable and articulable suspicion of criminal activity. The reasonable suspicion test has been described as an intermediate standard requiring more than unfounded speculation but less than probable cause. At a minimum, the officer must have a particularized and objective basis for suspicion. When determining the legitimacy of an investigative stop, a court must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.
>
> An investigative stop also must be reasonably related in scope to the circumstances which justified the interference in the first place. If a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns. If he has a reasonable basis to suspect that the subject of his inquiry may be armed, he also may frisk the suspect and undertake a limited search of the passenger compartment of any vehicle in which he is sitting. Once again, context is vital in determining the permissible scope of an investigative stop.

*United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (citations and internal quotation marks omitted); *see also, e.g., United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) ("In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.") (citations and internal punctuation omitted).[1]

"The government bears the burden of showing that [a] purported *Terry* stop is constitutionally valid." *United States v. Espinoza*, 433 F.Supp.2d 186, 190 (D. Mass. 2006). It meets that burden here.

At hearing, defense counsel posited that the dispositive question for purposes of the instant motion is whether information gleaned by MacVane from the SOI and passed on to the arresting agents pursuant to the "collective knowledge" doctrine was sufficiently reliable to permit those agents to effectuate the stop.[2] He argued that it was not, contending that:

1. The only reason MacVane initiated the instant investigation was because of the call

---

[1] At hearing, defense counsel confirmed, as is reflected in the defendant's brief, that his client does not claim that any action taken subsequent to the stop exceeded the scope of permissible *Terry*-stop bounds or otherwise was problematic. *See generally* Motion To Suppress. Disposition of the instant motion hence turns on the lawfulness of the stop itself.

[2] Pursuant to the collective-knowledge doctrine, a court assessing the existence of probable cause for an arrest or reasonable suspicion for a *Terry* stop takes into account the pooled knowledge of officers involved in an investigation rather than focusing narrowly on what the officers who physically effectuated the stop or arrest knew. *See, e.g., Cook*, 277 F.3d at 86 ("As the Supreme Court has repeatedly noted, common sense and practical considerations must guide judgments about the reasonableness of searches and seizures. Here, common sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop.") (citations omitted); *United States v. Meade*, 110 F.3d 190, 194 (1st Cir. 1997) ("The 'collective knowledge' or 'pooled knowledge' principle has been used to validate arrests in two ways: (1) by tracing the arresting officer's action back to an *individual* in a law enforcement agency who possessed information sufficient to establish probable cause, and (2) by finding that the directing *agency* as a whole possessed the necessary *(continued on next page)*

from the SOI.

2. The only reason Lally and Durst went to the Radisson garage to stop the Chevrolet Impala was because MacVane requested that they do so.

3. While MacVane knew that the SOI had provided information in August 2005 that turned out to be reliable, leading to two convictions in one matter, for which the SOI was paid (thus launching his career as a CI), MacVane also knew that the SOI's career as a CI had come to a quick end upon discovery that the SOI had been engaging in unauthorized drug transactions. The SOI, in essence, was deactivated as a CI because he was untrustworthy.

4. There is no evidence that, after August 2005, the SOI provided any information that led to an arrest or conviction. Thus, nothing occurred after his deactivation that would have rehabilitated his credibility. In fact, as Lally and Durst knew, the SOI continued to engage in drug dealing, having become a target of an MDEA investigation and having sold drugs to an undercover MDEA agent.

5. When the SOI initially contacted MacVane out of the blue on October 4, 2006, MacVane was unable to corroborate virtually any of the SOI's tip. Nothing of significance occurred at the Lafayette Building. MacVane did see a tan SUV at the Motel 6, but the SUV apparently had no further significance. MacVane, who had never previously seen or heard of Wright, was not in a position to corroborate that the individual at the Motel 6 whom he described to the SOI was in fact Wright. In any event, Wright had no further significance.

6. While Durst and Lally did find the car described by the SOI at the Radisson garage, they had no basis to believe its occupants were involved in drug activity apart from the statement made by the SOI, whose information to that point had not been corroborated or demonstrated to be reliable.

_____
facts.") (citation and internal quotation marks omitted) (emphasis in original).

7. Inasmuch as the agents did not possess reasonable articulable suspicion of criminal activity sufficient to stop the vehicle, fruits of the unlawful search must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471 (1963)); *see also, e.g., United States v. Woodward*, 173 F. Supp.2d 64, 71 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) (evidence is suppressible as fruit of poisonous tree, pursuant to *Wong Sun*, if it has "been come at by exploitation of the illegality as opposed to by means sufficiently distinguishable to be purged of the primary taint") (citation and internal punctuation omitted).

At hearing, counsel for the government acknowledged that (i) the SOI was playing both sides of the fence (engaging in illegal drug trafficking while phoning MacVane with information), (ii) his motives were questionable and (iii) not all of his information, particularly that provided on October 4, 2006, was corroborated or panned out as predicted. Nonetheless, she contended that agents possessed reasonable, articulable suspicion to stop the Impala inasmuch as (i) the risk that an informant is lying need not be totally eliminated, and (ii) via database searches, personal observation and practical judgment based on their training and years of law-enforcement experience,[3] agents in this case were able to corroborate the SOI's information sufficiently to have reasonable, articulable suspicion that the Impala contained cocaine. *See, e.g.*, Government's Opposition to Defendant's Motion To Suppress Physical Evidence and Statements, etc. (Docket No. 17) at 9-10. This, in the government's view, justified the agents in detaining the Impala for purposes of quickly confirming or dispelling their suspicions rather than permitting it simply to exit the parking garage and disappear from sight. *See, e.g., id*. The government makes a persuasive case.

---

[3] At hearing, counsel for the government calculated that the three agents involved in this case had approximately forty-seven years' combined law-enforcement experience. By my calculations, the total is thirty-eight-and-a-half years. Nonetheless, the precise figure does not matter. It is fair to say that all three were seasoned law-enforcement officers.

As the government posits, agents were under no obligation to eliminate the risk that the SOI was lying. *See, e.g., United States v. Winchenbach*, 197 F.3d 548, 556 (1st Cir. 1999) ("[T]he risk that [an] informant is lying or in error need not be wholly eliminated. Rather, what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations.") (citation and internal quotation marks omitted). Nor were they required to adjudge his information worthless when certain bits and pieces did not play out as forecast or were otherwise uncorroborated. *See, e.g., United States v. Diallo*, 29 F.3d 23, 26 (1st Cir. 1994) ("According to defendants, the information [provided by an informant] was unreliable because the informant stated that there would be three men in a red Toyota when in actuality there were four men in two cars. The inconsistencies between the informant's information and the reality of the situation were not of such importance that the information could be concluded to be incorrect. The informant was correct as to the identities of three of the four men along with the night the activity would take place and one of the vehicles used. A tipster need not deliver an ironclad case to the authorities on the proverbial silver platter. It suffices if a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them.") (citation and internal punctuation omitted). Nor need they have jettisoned the tip based on lingering doubt about the SOI's motives to the extent that they could corroborate detailed information that seemingly could have been gleaned only from firsthand knowledge on the SOI's part. *See, e.g., Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case.").

While the SOI's history contained indicia of unreliability – he had a lengthy criminal record,

had not relayed information of value since October 2005 and, most notably, had failed to inform MacVane he was engaging in unauthorized drug trafficking, leading to his deactivation as a CI in February 2006 – there also were some countervailing indicia of reliability. The SOI had provided information that led directly to the arrest and conviction of two defendants and indirectly to the arrest and conviction of a third, and both Lally and Durst believed that his known ongoing drug trafficking placed him in a position to have personal knowledge of the events he alleged were transpiring or about to transpire. *See, e.g., United States v. Jordan*, 999 F.2d 11, 14 (1st Cir. 1993) (reliability of confidential informant's hearsay statements "may be corroborated by various means, including direct surveillance or circumstantial evidence, or vouchsafed by the affiant – in this case a highly experienced law enforcement officer. McGill attested that the confidential informant had provided reliable information and investigative assistance to the police in the past, which may have been sufficient in itself to establish the reliability of the informant's hearsay statements.") (citations omitted).

As underscored by counsel for the government at hearing, agents were able to corroborate significant aspects of the SOI's tip by both database searches and personal observation, particularly on the pivotal day, October 5, 2006. This included corroboration:

1. By MacVane via a DEA database check and personal conversation with a fellow drug-enforcement agent on October 4, 2006 that a person named Barry Wright not only existed but also had been arrested for trafficking in cocaine.

2. By MacVane that day that a group of people had traveled to a certain Motel 6 in a tan SUV.

3. By MacVane and/or Lally on October 5, 2006 that the Michigan license plate number provided by the SOI was registered to an Alamo rental car matching the description of the vehicle

given by the SOI (a maroon Chevrolet Impala).

    4.    By Lally and Durst that a car fitting the exact description given by the SOI and bearing the identical license-plate number he had provided was in the Radisson garage and was being operated by a black male, just as the SOI had foretold (although the vehicle turned out to have been driven by the defendant rather than by Wright).

    5.    By Lally and Durst that the car appeared to have sustained fresh damage to its bumper, consistent with the SOI's report that the car had just been involved in an accident.

In short, based on the combination of (i) past indicia of the SOI's reliability, (ii) his status as a person likely to have personal knowledge of drug-trafficking crimes, (iii) agents' corroboration on October 5, 2006, of details supplied by the SOI regarding the car's make, model, color, license plate, driver and whereabouts, and (iv) agents' observation that, consistent with the SOI's report of an accident, the car appeared to have sustained fresh damage to its bumper, agents possessed "a particularized and objective basis for suspicion" that one or more of the Impala's occupants was engaged in cocaine trafficking, as the SOI had stated was the case. No more was required.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 12th day of April, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge